## SLIGH FURNITURE CO. v. AUTOMATIC MUSICAL INSTRUMENT CO.

### No. 2413.

District Court, W. D. Michigan, S. D.
Dec. 16, 1932.

Dunham, Cholette & Allaben, of Grand Rapids, Mich., for plaintiff.

Knappen, Uhl, Bryant & Snow, of Grand Rapids, Mich., for receiver.

Renihan & Lilly, of Grand Rapids, Mich., for defendant.

McAllister & McAllister, of Grand Rapids, Mich., for Walter Ioor.

RAYMOND, District Judge.

The above matters have been heard upon exceptions filed by the receiver to the master's report allowing the same as ordinary claims. The master disallowed the claims of petitioners that they were entitled to preferred status on the theory that the funds in the hands of the receiver were impressed with a trust in favor of claimants. No exceptions were filed by claimants.

The report of the master finds the facts in substance as follows:

"Mr. W. Ioor was president of the National Piano Manufacturing Company, an Arizona corporation, and also of the defendant company, a Delaware corporation, and Mr. S. D. Thompson was secretary and treasurer of both corporations. * * *

"This California Pool syndicate agreement was entered into in the year 1929 between Walter Ioor, as manager, and the several claimants as subscribers.

"This agreement among other things provided:

" 'The object of the syndicate shall be to operate for profit by the purchase and the sale of stocks in the Automatic Musical Instrument Company, a Delaware Corporation; Automatic Musical Instrument, Ltd., of Canada; British Automatic Gramaphone Company, Ltd., of England.

" 'The manager shall purchase such said stocks as may be available from any source with the funds of the syndicate and may sell and deal in the same as his judgment may dictate, having the sole direction and management of the entire conduct of the business and transactions of the syndicate.

" 'The total amount of the subscriptions shall not be in excess of $500,000 and the termination of the syndicate shall occur at noon April 15th, 1930, and the pro rata distribution of the net assets shall be made within ten days thereafter.'

"Payments were made to the pool through checks of the claimants, payable to the order of Walter Ioor, as follows: D. M. Griffith, No. 744, by his check dated January 10, 1930, for $300.00. * * *

"William C. Straehley, by his checks, viz.: * * * No. 761

| | |
|---|---|
| January 15, 1930 | $ 3,000.00 |
| February 10, 1930 | 1,500.00 |
| March 1, 1930 | 5,000.00 |
| March 18, 1930 | 2,000.00 |
| Total: | 11,500.00 |

"Glenn B. Churchill, No. 1023, by his check paid January 10, 1930, for $1,500. * * *

"These checks were endorsed by Mr. Ioor, viz: 'For deposit acct. of Walter Ioor, Manager' and deposited by him in the American National Bank to his account as 'Walter Ioor, Manager'. * * *

"This bank account, 'Walter Ioor, Manager' was opened on January 9, 1930. * * *

"Stock of the National Piano Manufacturing Company was purchased at $11.00 per share for and with money from the Pool fund, viz:

| | | |
|---|---|---|
| February 10, 1930 | 500 shares— | $ 5,500.00 |
| February 10, 1930 | 241 " | 2,651.00 |
| March 6, 1930 | 455 " | 5,005.00 |
| Total: | 1196 shares— | $13,156.00 |

" * * * This stock was later exchanged for stock of the defendant, Automatic Musical Instrument Company. The transaction was consummated as follows:

"The checks of Walter Ioor, Manager, were delivered to S. D. Thompson as treasurer of the National Piano Manufacturing Co., by him endorsed and delivered to himself as treasurer of the defendant, Automatic Musical Instrument Company, and were thereupon deposited in the American National Bank to the account of the defendant, Automatic Musical Instrument Company. * * *

"The National Piano Manufacturing Company credited the payments on its indebtedness to the defendant company. * * *

"The certificates of stock of the National Piano Manufacturing Company were delivered to S. D. Thompson, secretary of the defendant company, by Miss Cavanaugh, an employee of the defendant and secretary to Mr. Ioor, and she received in exchange therefor certificates of Class A and Class B of defendant's stock. * * *

"The certificates of defendant's stock so exchanged and received for the pool were all dated April 22, 1930, or some prior date. * * *

"Prior to April 25, 1930, at which date the distribution under the pool agreement was to have been made, the defendant had issued for the pool 1135 shares of Class A and 517½ shares of Class B stock, Certificates for 99 shares of Class A and 99½ of Class B stock, as hereinbefore noted, were not issued until January 27, 1931. This condition and shortage, however, was explained as being on account of an error in computation and the later dated certificates were issued to correct the same. * * *

"Shortly after February 9, 1931, Mr. Ioor delivered these certificates to Mr. Thompson, secretary of the defendant company, and requested him to 'have split up such certificates as would be necessary to segregate the two lots of stock, that was·bought originally from the National Piano Manufacturing Company and that bought from outsiders'.

"This split-up and re-issue was not accomplished prior to the receivership, and the certificates hereinbefore noted are still held by Mr. Thompson. * * *

"The records of the National Piano Manufacturing Company did not show where the money for the purchase of its stock came from.

"Mr. Thompson, secretary and treasurer of that company, and of the defendant company, had no official knowledge of this California pool; he did, however, know there was a California pool, of some nature, to invest in the stock of the defendant company, but was not advised as to its limitations. * * *,

"S. D. Thompson, treasurer of the defendant company, did not have such notice of the violation of the California Pool agreement as could impress the fund in its hands with a trust in favor of the claimants. Walter Ioor, president of the defendant company, and manager of the Pool was, in this transaction, acting adversely to the interests of the defendant company and his knowledge may not be imputed to the defendant.

"The claimants' money, however, did pass into the possession and control of the defendant company, which accepted and retained the benefit thereof, and its assets were accordingly enhanced. The president and treasurer of the defendant had knowledge that the money came from the California Pool. The stock of the defendant, while issued for the pool, was not delivered to the claimants and is still in the possession of defendant's treasurer * * *. The relationship of Walter Ioor as manager of the pool, and as president of the defendant company, was such that, in my opinion, equity demands that these claims be allowed as ordinary claims and with interest at five

per cent (5%) from April 25, 1930, when distribution was to have been made under the pool agreement, to the date of the receivership, February 10, 1931."

The only question presented by the exceptions filed is whether the claims should have been allowed as ordinary claims.

No evidence is found in the record that in the formation or execution of the provisions of the pool agreement, Mr. Ioor was acting in behalf of the Automatic Musical Instrument Company or that he in any way held himself out as acting for it. The agreement was clearly a personal one and did not purport in any way to bind the company. Nothing is found to indicate that the company was in any way responsible for the apparently unauthorized acts of Ioor in first purchasing stock in the defunct National Piano Manufacturing Company. The transaction as finally consummated resulted in the accomplishment of the precise purpose of the agreement, viz., the acquisition of shares in the defendant company. No loss or injury resulted to claimants from the irregular and unauthorized intermediary transactions. It is fair to assume that on the date provided in the agreement for the final termination of the syndicate, viz., April 25, 1930, any claimant, on demand, would have attained the precise object of entering into the agreement, viz., an appropriate number of shares of stock in defendant company. Had he done so, he would (in the absence of special circumstances of which there is here no proof) have been in the same legal position as the remaining stockholders at the date of receivership on February 10, 1931. The fact that no action was taken by claimants until after receivership does not give them the status of creditors. They were content at the time of their respective investments to enter upon a stock speculation and to entrust Mr. Ioor with the sole management of their funds. The facts found by the master relative to the knowledge and authority of Thompson and Ioor deny the conclusion that claimants have rights as creditors.

An order will accordingly be entered sustaining the exceptions filed by the receiver.